IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| JERYL DANIELS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 1:18 CV 267 MTS |
| | ) | |
| JASON LEWIS, | ) | |
| | ) | |
| Respondent. | ) | |

**Memorandum and Order**

This matter is before the Court on Petitioner Jeryl Daniels's Petition under 28 U.S.C. § 2254 for writ of habeas corpus, Doc. [1]. For the following reasons, Petitioner's § 2254 petition is denied.

**I.     Procedural History**

Petitioner is currently incarcerated at the Jefferson City Correctional Center in Jefferson City, Missouri. On September 25, 2013, Petitioner was charged in the Circuit Court of St. Louis County, Missouri with murder in the first degree, two counts of assault in the first degree, and three counts of armed criminal action. Doc. [8-4] at 7-8. After a jury found him guilty of all counts, he was sentenced to life imprisonment without the possibility of parole for the murder, and five concurrent terms of fifteen-years imprisonment for the assault in the first degree counts and the armed criminal action counts. See Docs. [8-2] at 553-557, and [8-4] at 78-81. On June 14, 2016, Petitioner's convictions and sentences were affirmed on direct appeal in *State of Missouri v. Daniels*, ED 102826, 491 S.W.3d 680 (Mo. App. E.D. 2016). Doc. [8-8].

Petitioner filed a timely pro se Missouri Supreme Court Rule 29.15 motion, and an amended motion was filed by post-conviction counsel on October 5, 2016. Doc. [8-11] at 21. After

an evidentiary hearing was held on December 1, 2016, the motion court issued findings of fact and conclusions of law denying Petitioner's amended motion for post-conviction relief. Petitioner appealed the motion court's findings, and on July 24, 2018, the court of appeals affirmed the motion court's decision. *Daniels v. State of Missouri*, ED 105432, 551 S.W.3d 110 (Mo. Ct. App. E.D. July 24, 2018). Doc. [8-15]. On November 1, 2018, Petitioner filed a writ of habeas corpus in this Court, pursuant to § 2254. Doc. [1].

II.     **Factual Background**

On June 1, 2013, Michael Curtis ("Curtis"), Ryan Thurman ("Thurman"), and Marrion Dotson ("Dotson") went to visit their friend Shay. Curtis, Thurman, and Dotson decided to rob Petitioner.  Curtis and Thurman called Petitioner, asked to purchase marijuana from him, and arranged to meet with him. Around 12:30 p.m., Curtis and Thurman left Shay's house and walked across the street to Petitioner's apartment. Dotson stayed behind. Curtis was carrying a handgun in the pocket of his jacket. Curtis and Thurman met Petitioner on the ground floor of his apartment building. Soon thereafter, Curtis pulled out the gun, while Thurman searched Petitioner's pockets and took marijuana, money, and Petitioner's driver's license. Thurman and Curtis brought the items back to Shay's house. Curtis and Thurman split up the money and marijuana, while Dotson took Petitioner's driver's license and put it in his pants pocket. Approximately a half an hour later, Curtis, Thurman, and Dotson walked to Curtis's home and shot dice for about an hour. They then left Curtis's home around 2:00 p.m. and began walking back to Shay's house. While walking, Curtis saw a blue Chevrolet Impala pause for approximately thirty seconds at a nearby stop sign. Soon after, Petitioner leaned out of the passenger side window of the Impala and shot at them with a rifle. As Curtis, Thurman, and Dotson ran away, the car moved toward them. Petitioner shot a total of twenty-one rounds at them from the Impala. Thurman died at the scene. Curtis and Dotson were injured. Thurman was shot once in the leg and once in the back of the neck through his spinal

cord. Curtis was shot in the buttocks, and Dotson was shot in the arm. Curtis and Dotson were hospitalized for their injuries.

Two men who lived on the same street where the shooting occurred, Stephen Azar ("Azar") and Phillip Greenlee ("Greenlee"), heard and witnessed portions of the shooting. Azar was on his porch when he heard shots being fired outside of his house. He saw an individual hanging out of the passenger window of a blue Chevrolet Impala holding a gun and shooting at three young men, killing one of them. Azar called 911 while the vehicle was fleeing the scene. Greenlee also heard shots being fired and then saw a blue Chevrolet Impala driving slowly in front of his house. At the scene, police recovered twenty-one shell casings fired from a .223 rifle. Police also recovered Petitioner's driver's license from Dotson's pants at the hospital. After Curtis was treated for his injuries, he identified Petitioner from a photo lineup as the person who shot at them.[1] Police subsequently arrested Petitioner and searched his cell phone. Officers discovered Petitioner and his girlfriend Daisha Ketchum ("Girlfriend") made several calls to one another on the day of the shooting; after the time Petitioner was robbed at approximately 12:30 p.m. and shortly before and after the time the shootings occurred at approximately 2:00 p.m. During the investigation, police also discovered Girlfriend owned a 2001 blue Chevrolet Impala. Girlfriend told the police that she had loaned her car to Petitioner on the day of the shooting. The police subsequently showed pictures of the car to Curtis and Azar, and they both identified it as the car involved in the shooting.

Petitioner presented an alibi defense at trial based on the testimony of one witness, Jamar Henderson ("Henderson"). Henderson, who had been friends with Petitioner for over 15 years, testified that Petitioner called him about 1:00 p.m. on the day of the robbery, and that Petitioner came to his house around 1:20 p.m. After spending time with Henderson's nephews, Petitioner

---

[1] Curtis also testified at Petitioner's trial that on the day of the shooting he saw Petitioner fire a gun multiple times at him, Thurman, and Dotson from the passenger side of a blue Chevrolet Impala.

3

and Henderson left Henderson's house around 2:00 p.m. Henderson testified that they then drove to Spanish Lake in Petitioner's white Maxima to pick up some money they had loaned to a friend. They also went to a couple of stores before returning to Henderson's place between 6:00 p.m. and 7:00 p.m. Henderson testified they were never in a blue Impala or near the scene of the shooting that day.

Although Henderson visited Petitioner 62 times while Defendant was in jail pending trial, Henderson testified he never spoke to police about their whereabouts on the day of the shooting because the police never called him, despite phone records to the contrary. Doc. [8-2] at 462. During cross-examination, Henderson was questioned about his failure to come forward with the alibi sooner. Henderson admitted he first spoke to Petitioner's attorney about Petitioner's alibi in September 2014, over a year after Petitioner's arrest. Henderson admitted that even though he was aware that Petitioner had been arrested for Thurman's death as soon as it happened, he did not provide an alibi for Petitioner until much later because "it never came up." Doc. [8-8] at 4-5. Henderson also testified that he did not think the alibi was enough and that he thought it was enough to tell Petitioner's attorney. Doc. [8-2] at 474-475. During closing argument, the State referred to Henderson as an admitted liar who had admitted to providing false information, *Id.* at 525, and that Henderson was not credible because he never told his probation officer or police that Petitioner, his best friend, was with him during the time the crimes were being committed.

After considering all the evidence, the jury found Petitioner guilty of one count of murder in the first-degree, two counts of assault in the first-degree, and three counts of armed criminal action. The trial court sentenced Petitioner, as a prior offender, to life imprisonment without the possibility of parole for the murder count, and to fifteen years of imprisonment for each of the remaining counts, with the sentences to run concurrently. Petitioner subsequently filed a direct appeal. His convictions and sentences were affirmed. *State of Missouri v. Daniels*, 491 S.W.3d

680 (Mo. App. E.D. 2016). While his direct appeal was still pending, Petitioner prematurely filed a pro se Rule 29.15 motion for post-conviction relief. The motion court issued an order appointing post-conviction counsel for Petitioner on September 24, 2015. The motion court then granted counsel's motion to hold Petitioner's post-conviction relief file open pending the conclusion of his direct appeal. After the mandate was issued in Petitioner's direct appeal, postconviction counsel filed an amended motion for post-conviction relief, alleging several ineffective assistance of counsel claims. Subsequently, the motion court held an evidentiary hearing on Petitioner's amended motion. Following the hearing, the motion court entered findings of fact and conclusions of law denying Petitioner's Rule 29.15 motion. Petitioner appealed, and the motion court's decision was affirmed in *Daniels v. State of Missouri*, ED 105432, 551 S.W.3d 110 (Mo. App. E.D. 2018).

### III.  Legal Standards

#### a.  General

When a claim has been adjudicated on the merits in state court proceedings, habeas relief is permissible under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), though such relief is "limited and deferential." *Lomholt v. Iowa*, 327 F.3d 748, 751 (8th Cir. 2003). Under AEDPA, 28 U.S.C. § 2254(d), habeas relief is only permissible if the state court's determination:

> (1) Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

A state court's decision is "contrary to" clearly established Federal law if "it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set

5

of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005). "[T]he state court need not cite or even be aware of the governing Supreme Court cases, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Brown v. Luebbers*, 371 F.3d 458, 467 (8th Cir. 2004) (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)). "In the 'contrary to' analysis of the state court's decision, [the federal court's] focus is on the result and any reasoning that the court may have given; the absence of reasoning is not a barrier to a denial of relief." *Id.*

A decision involves an "unreasonable application" of clearly established law if "the state court applies [the Supreme Court's] precedents to the facts in an objectively unreasonable manner," see *Payton,* 544 U.S. at 141 and *Williams v. Taylor*, 529 U.S. 362, 407 (2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* "Clearly established" Supreme Court law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id*. at 412. "Federal habeas relief is warranted only when the refusal was 'objectively unreasonable,' not when it was merely erroneous or incorrect." *Carter v. Kemna*, 255 F.3d 589, 592 (8th Cir. 2001) (quoting *Williams*, 529 U.S. at 410–11). "An 'unreasonable application' is different from an incorrect or erroneous application; a prisoner must establish that a state court's adjudication was not only wrong, but also objectively unreasonable, such that 'fair-minded jurists' could not disagree about the proper resolution." *Smith v. Titus*, 958 F.3d 687, 691 (8th Cir. 2020) (quoting *Yarbrough v. Alvarado*, 541 U.S. 652, 664 (2004)).

When reviewing whether a state court decision involves an "unreasonable determination of the facts," state court findings of "basic, primary, or historical facts" are presumed correct unless the petitioner rebuts the presumption with clear and convincing evidence. *Collier v. Norris*, 485

6

F.3d 415, 423 (8th Cir. 2007) (citations omitted); § 28 U.S.C. § 2254(e)(1).

    b. <u>Procedural Default</u>

In Missouri, "a claim [must] be presented 'at each step of the judicial process' in order to avoid default." *Jolly v. Gammon*, 28 F.3d 51, 53 (8th Cir. 1994) (quoting *Benson v. State*, 611 S.W.2d 538, 541 (Mo. Ct. App. 1980)). A federal court may only grant habeas relief to a state prisoner who has exhausted available state remedies. *See* § 2254(b)(1)(A). A prisoner satisfies the exhaustion requirement by properly pursuing a claim throughout the entire appellate process of the state. *Wayne v. Mo. Bd. Of Prob. & Parole*, 83 F.3d 994, 998 (8th Cir. 1996). If a petitioner fails to comply with state procedural rules in presenting a federal constitutional claim in the appellate process, a procedural default occurs. If defaulted, the state will decline to address the merits of the claim. So long as the default rests upon "adequate and independent state grounds," the petitioner is generally barred from obtaining federal habeas review of the defaulted claim. *Harris v. Reed*, 489 U.S. 255, 262 (1989); *Coleman v. Thompson*, 501 U.S. 722, 729–31 (1991). However, a state prisoner can seek federal review of a claim for habeas relief, even though it has been procedurally defaulted, by "demonstrat[ing] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750.

    c. <u>Ineffective Assistance of Trial Counsel</u>

To prevail on an ineffective assistance of counsel claim, a petitioner must show that his attorney's performance fell below an objective standard of reasonableness and that he was prejudiced thereby. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). With respect to the first *Strickland* prong, there is a strong presumption that counsel's conduct falls within the wide range of professionally reasonable assistance. *Id.* at 689. Thus, "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable

professional judgment,'" and the "burden to 'show that counsel's performance was deficient' rests squarely on the defendant." *Burt v. Titlow*, 571 U.S. 12, 22–23 (2013) (quoting *Strickland*, 466 U.S. at 690). A reviewing court must refrain "from engaging in hindsight or second-guessing of trial counsel's strategic decisions." *Abernathy v. Hobbs*, 748 F.3d 813, 816 (8th Cir. 2014) (citation omitted). To establish the "prejudice" prong, the movant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Merely showing a conceivable effect is not enough; a reasonable probability is one sufficient to undermine confidence in the outcome." *Paulson v. Newton Corr. Facility*, 773 F.3d 901, 904 (8th Cir. 2014) (citation omitted). Although *Strickland* requires a showing of both deficient performance and prejudice, a "finding that no prejudice exists is sufficient to conclude that counsel was not constitutionally ineffective—[courts] need not first make a determination regarding deficiency." *Holder v. United States*, 721 F.3d 979, 987 (8th Cir. 2013). "Taken together, AEDPA and *Strickland* establish a 'doubly deferential standard' of review." *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (quoting *Cullen v. Pinholster,* 563 U.S. 170, 202 (2011)).

> First, under *Strickland*, the state court must make a predictive judgment about the effect of the alleged deficiencies of counsel on the outcome of the trial, focusing on whether it is "reasonably likely" that the result would have been different absent the errors. *Strickland*, 466 U.S. at 696. The *Strickland* prejudice standard is less demanding than a more-probable-than-not standard, but the difference is "slight and matters only in the rarest case." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). To satisfy *Strickland*, the likelihood of a different result must be "substantial, not just conceivable." *Id*. Under AEDPA, [federal courts] must then give substantial deference to the state court's predictive judgment. So long as the state court's decision was not "contrary to" clearly established law, the remaining question under the "unreasonable application" clause of § 2254(d) is whether the state court's determination under the *Strickland* standard is unreasonable, not merely whether it is incorrect. *Id*. at 785. This standard was meant to be difficult to meet, and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786.

8

*Williams*, 695 F.3d at 831. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

## IV.  Discussion

Petitioner asserts seven grounds for relief. Grounds 1, and 3–7 were reviewed on the merits by the court of appeals. Ground 2 was reviewed by the court of appeals under plain error review because the claim was defaulted by lack of objection at trial and lack of inclusion in Petitioner's motion for new trial. The Court will now review each ground, in turn.

**a. Ground One: Petitioner alleges he was denied due process of law and a fair trial because the State's evidence was insufficient to support a finding of guilt of murder in the first-degree beyond a reasonable doubt.**

A federal court's review of a sufficiency of the evidence claim "is limited to determining 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Gibbs v. Kemna*, 192 F.3d 1173, 1175 (8th Cir. 1999) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Petitioner claims that because the victims had robbed him shortly before he shot them, killing one of them, he did not deliberate on the murder. Under Missouri law deliberation means cool reflection for any length of time no matter how brief. Doc. [8-8] at 6. The court of appeals found that there was sufficient evidence for a reasonable juror to find that Petitioner deliberated. The robbery of Petitioner at his apartment building occurred at approximately 12:30 p.m. Doc. [8-2] at 228. The shooting occurred at approximately 2:00 p.m., supporting a reasonable inference that Petitioner was motivated to seek revenge and coolly reflected on the murder. "Deliberation is not a question of time—an instant is sufficient[.]" *State v. Nathan*, 404 S.W.3d 253, 266 (Mo. banc 2013). "[T]he element of deliberation serves to ensure that the jury believes the defendant acted

deliberately, consciously and not reflexively." *Id.*

At the time of the shooting, the blue Impala paused at a stop sign for approximately thirty seconds, giving the victims time to approach. Petitioner leaned out of the passenger side window of the Impala and shot at the victims twenty-one times, inflicting multiple wounds to the victims, including the fatal gunshot wound to Thurman. "Evidence of . . . multiple wounds . . . support an inference of deliberation." *State v. Ervin*, 979 S.W.2d 149, 159 (Mo. banc 1998). Also, evidence of multiple victims supports an inference of deliberation. *State v. Tisius*, 92 S.W.3d 751, 764 (Mo. banc 2002). Further, after firing multiple shots at the victims, one of whom fell to the ground immediately, Petitioner fled the scene without seeking help for the victims. "[F]ailure to seek medical help for a victim strengthens the inference that the defendant deliberated." *State v. Strong*, 142 S.W.3d 702, 717 (Mo. banc 2004) (internal quotations and citation omitted). Finally, Petitioner's phone records supported the inference that he planned and deliberated upon his actions. There were four phone calls between Girlfriend and Petitioner after the robbery, prior to the murder, and after the murder; and Girlfriend admitted loaning Petitioner her Impala on the day of the murder.

If any reasonable juror could have found the elements of the offense beyond a reasonable doubt, taking the evidence, all reasonable inferences from the evidence, and all credibility determinations in the light most favorable to state, then the evidence is constitutionally sufficient. *Jackson,* 443 U.S. at 319. The court of appeals found that there was ample evidence for the jury to find that that Petitioner deliberated. The decision of the court of appeals is not contrary to clearly established law, is consistent with a reasonable application of *Jackson*, and as such, must be left undisturbed under 28 U.S.C. § 2254(d). Ground One is denied.

**b.    Ground Two: Petitioner alleges that the trial court plainly erred in failing to *sua sponte* intervene in the cross-examination of defense alibi witness Jamar Henderson because the prosecutor badgered the witness over his failure to come forward and argued with the answers he gave to questions regarding why he never told police about Petitioner's alibi.**

Petitioner claims the trial court should have *sua sponte* interrupted the State's cross-examination of Petitioner's alibi witness, Henderson, because it was badgering and argumentative to point out Henderson's failure to come forward with Petitioner's alibi sooner. Petitioner's counsel did not object to the State's cross-examination of Henderson at trial and did not include this claim of error in his motion for new trial. Doc. [8-8] at 8. As such, this claim was not preserved for appellate review under Missouri Supreme Court Rule 29.11(d) and is defaulted, unless Petitioner can demonstrate cause and actual prejudice, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.  Although the claim was not preserved, the court of appeals reviewed it for plain error under Missouri Supreme Court Rule 30.20.[2]

In general, "a trial court has an obligation to ensure that a criminal defendant has a fair trial, including the obligation to exercise its discretion to control obvious misconduct by the prosecution." *State v. Roper*, 136 S.W.3d 891, 902 (Mo. App. W.D. 2004) (citation omitted). However, "Missouri courts have been reluctant to criticize a trial court when it has declined to take action on its own motion on behalf of a party during the examination of a witness." *Id.* "Indeed, such invitations have been rejected in all but the most unusual circumstances." *Id.* Trial courts are vested with broad discretion in determining the permissible scope of cross-examination on issues that may be pertinent to a witness's credibility. *State v. Curry*, 364 S.W.3d 756, 758 (Mo. App. E.D. 2012). "Cross-examination tests the accuracy, veracity, and credibility of a witness, and therefore, cross-examination is not necessarily limited to those issues that tend to prove the issues at trial." *Curry*, 364 S.W.3d at 758 (*citing State v. Gardner*, 8 S.W.3d 66, 72 (Mo. banc 1999)).

---

[2] Plain error review does not excuse the default of the claim in the trial court. *Clark v. Bertsch,* 780 F.3d 873, 874 (8th Cir. 2015); *Toney v. Gammon,* 79 F.3d 693, 698–99 (8th Cir. 1996); *see also Hayes v. Lockhart,* 766 F.2d 1247, 1252–53 (8th Cir. 1985).

11

Trial judges are given wide latitude to impose reasonable limits on cross-examination to avoid prejudice, confusion of the issues, and interrogation that is only marginally relevant. *State v. Mann*, 23 S.W.3d 824, 835 (Mo. App. W.D. 2000) (*citing State v. Dunn*, 817 S.W.2d 241, 245 (Mo. banc 1991)). Trial courts also have broad discretion to preclude repetitive and unduly harassing interrogation and to limit attacks on general credibility and attempts to elicit irrelevant, collateral, or stale matters. *State v. Russell*, 625 S.W.2d 138, 141 (Mo. banc 1981) (citations omitted).

Petitioner claims that the State's cross-examination of Henderson became a prolonged argument and attack on the witness, as opposed to an examination. On direct examination, Henderson attempted to provide a complete alibi for Petitioner on the date of the murder. Henderson testified that Petitioner called him about 1:00 p.m. that day and then Petitioner arrived at Henderson's house at approximately 1:20 p.m. After spending time with Henderson's nephews, Petitioner and Henderson left Henderson's house around 2:00 p.m. They drove to Spanish Lake in Petitioner's white Maxima to pick up some money they had loaned to a friend. They then went to a couple of stores before returning to Henderson's place between 6:00 p.m. and 7:00 p.m. Henderson testified they were never in a blue Impala or near the scene of the shooting that day. During cross-examination Henderson admitted that he first spoke to Petitioner's attorney about Petitioner's alibi in September of 2014, over a year after Petitioner's arrest, and approximately four months prior to Petitioner's trial, despite having visited Petitioner in jail over 62 times. Henderson admitted that even though he was aware that Petitioner had been arrested for Thurman's death as soon as it happened, he did not provide an alibi for Petitioner until much later because "it never came up," and that the police never contacted him, despite evidence that Detective Hokamp contacted him several times.[3] Doc. [8-2] at 455, 462-63. When Henderson was asked by Petitioner's counsel on

---

[3] It is also relevant to note that Henderson acknowledged in his testimony that the St. Louis County Police headquarters is across the street from the jail where he visited Petitioner a multitude of times. Doc. [8-2] at 475.

redirect why he never went to police with the alibi for Petitioner he answered, "I just didn't think it was enough" and that he thought it was enough to tell Petitioner's attorney. *Id*. at 474-75. On cross-examination, Henderson admitted he was currently on federal probation for a weapons charge, a drug charge, and had previously admitted to giving false information. *Id.* at 456-57. Henderson also denied that Petitioner asked him about obtaining a gun the day of the shooting. *Id.* at 472. The State later reminded the jury that Henderson was on probation for a weapons charge. *Id*.

The court of appeals determined that the State's cross-examination was not an attack on Henderson, but an attack on the believability of Henderson and the truth of his testimony, Doc. [8-8] at 10, especially given all other evidence presented at trial.[4] The court of appeals further pointed out that Henderson provided a complete alibi for Petitioner, so his credibility was not irrelevant, collateral or stale. *Russell*, 625 S.W.2d at 141. Ultimately, the court of appeals found that the State's cross-examination was proper and that the trial court did not commit any error, plain or otherwise, stating "[e]ven if assuming, *arguendo*, that plain error occurred, the trial court's failure to *sua sponte* prevent such cross-examination did not have a decisive effect on the jury's determination of [Petitioner's] guilt." Doc. [8-8] at 10.

Petitioner has failed to meet his burden of overcoming the default by demonstrating cause and actual prejudice as a result of the alleged violation under *Coleman,* 501 U.S. 722. Petitioner's claim is procedurally barred. Ground Two is denied.

**c. Ground Three: Petitioner alleges that trial counsel was ineffective for failing to object when the prosecutor misstated the *mens rea* element of the lesser included offense of murder in the second-degree during closing argument.**

---

[4] Curtis testified he saw the blue Impala pull up to a stop sign and saw Petitioner fire multiple shots at him and his friends from the passenger side of the car. Curtis also identified Petitioner as the shooter from a photo lineup shown to him by police. In addition, Azar testified he observed the shooting and a person holding a gun, leaning out of the passenger window of a dark blue car. Greenlee testified he heard multiple gunshots and saw a dark blue Chevy Impala driving slowly past the front of his house. Furthermore, Girlfriend admitted to the police that she had loaned her dark blue Impala to Petitioner on the day of the murder.

Petitioner claims that trial counsel was ineffective for failing to object to a portion of the State's closing argument regarding the elements for murder in the second-degree. Instructions for murder in the first-degree and the lesser-included offense of murder in the second-degree were submitted to the jury under Count I for Petitioner's involvement in the shooting and death of Thurman. During the State's closing argument, the prosecutor told the jurors if they did not find Petitioner guilty of murder in the first-degree, they must consider whether he is guilty of murder in the second-degree. The prosecutor then told the jurors they could find Petitioner guilty of murder in the second-degree if they found, *inter alia*, he "caused the death of Ryan Thurman . . . [and Petitioner acted in a way that] was certain to cause physical injury or death to Ryan Thurman." The prosecutor's statement omitted the *mens rea* for murder in the second degree, and omitted the word "serious" before "physical injury," and therefore, did not fully describe the statutory elements of the crime. *See* section 565.021.1(1) RSMo 2000.

The jury ultimately found Petitioner guilty of murder in the first-degree. Juries are presumed to follow the instructions. *State v. Prine*, 456 S.W.3d 876, 885 (Mo. App. S.D. 2015) Accordingly, "[a]ny deficiencies in the State's [closing] argument were corrected by the trial court's instructions to the jury." *Johnson v. State*, 406 S.W.3d 892, 905 (Mo. banc 2013).

The court of appeals found that even assuming *arguendo* that trial counsel should have objected to the prosecutor's closing argument, Petitioner did not demonstrate prejudice because (1) the murder in the second-degree instruction submitted to the jury was correct, (2) jurors are presumed to follow the submitted instructions, so any deficiencies in argument were corrected by the instructions, and (3) Petitioner was convicted based on overwhelming evidence of the greater offense of murder in the first-degree, which required knowingly causing the death of the victim after

14

deliberation on the matter.[5] The decision of the court of appeals is not contrary to clearly established law and is consistent with a reasonable application of *Strickland*, 466 U.S. 668, and should be left undisturbed under 28 U.S.C. § 2254(d). Ground Three is denied.

**d.     Ground Four: Petitioner alleges that trial counsel was ineffective for failing to object when the prosecutor stated during closing argument that a defense witness, Marrion Doston, did not testify because he was afraid.**

Petitioner claims trial counsel was ineffective for failing to object to a portion of the State's closing argument regarding assault victim Dotson's failure to testify at trial. The prosecutor stated in relevant part:

> We didn't hear from Marrion, which, in cases like this, is actually more of the norm than the exception. People don't want to come forward. They're afraid. So we didn't hear from Marrion. But we know he was shot. We know he was shot in this incident on that date and time by [Petitioner]. Doc. [8-15] at 11.

At the post-conviction evidentiary hearing, trial counsel gave conflicting testimony regarding her failure to object to the prosecutor's comments. When trial counsel was initially asked by Petitioner's post-conviction counsel if she had a strategic reason for not making an objection, she answered, "No."  However, when trial counsel was asked more detailed questions during cross-examination, trial counsel testified she chose not to object to the prosecutor's comments regarding Dotson's failure to testify because there was evidence of other witnesses in the case not wanting to come forward and being forced to testify by subpoena. Trial counsel further testified that she "didn't

---

[5] Approximately an hour and a half prior to the shooting, Petitioner was robbed by Thurman and Curtis, providing a motive for Petitioner to murder Thurman. *See State v. Miller*, 220 S.W.3d 862, 868-69 (Mo. App. W.D. 2007) (deliberation can be demonstrated by "bad-blood evidence[,]" i.e., where there is a "pre-existing relationship between the victim and the defendant prior to the murder that provides a motive for the killing") (quoting *State v. Roberts*, 948 S.W.2d 577, 589 (Mo. banc 1997)). After the robbery, Petitioner obtained his Girlfriend's vehicle and a deadly weapon (a gun) before the vehicle was driven to the scene of the shooting and paused for thirty seconds before Petitioner fired the gun. *See State v. Sanders-Ford*, 527 S.W.3d 223, 226 (Mo. App. S.D. 2017) (deliberation can be inferred where a defendant arms himself with a deadly weapon before seeking out the victim). In addition, Petitioner shot twenty-one times at the three young men at close range. Thurman suffered multiple wounds before dying, and Petitioner fled the scene of the shooting without seeking medical help for Thurman. *See State v. Terry*, 501 S.W.3d 456, 460 (Mo. App. W.D. 2016) (finding an inference of deliberation under similar circumstances).

want to draw attention to the fact that there may have been pressure, for whatever reason, for these people not wanting to come forward." *Id.* at 11. The court of appeals deferred to the post-conviction motion court's factual findings where it relied on the portion of trial counsel's testimony demonstrating it was part of her trial strategy not to object to the State's closing argument. The court of appeals found that the motion court had a better opportunity to determine the credibility of parties during their testimony and that the motion court was free to believe or disbelieve any evidence, whether contradicted or undisputed. *See Jackson v. State*, 535 S.W.3d 374, 380-381 (Mo. App. E.D. 2017); *Rios v. State*, 368 S.W.3d 301, 317 (Mo. App. W.D. 2012). [Doc. 8-15] at 11.

Based on the foregoing, the court of appeals found that Petitioner did not overcome the strong presumption that trial counsel's performance was reasonable and effective. *See Zink v. State*, 278 S.W.3d 170, 176 (Mo. banc. 2009). The court of appeals decision is not contrary to clearly established law and is a reasonable application of *Strickland*, 466 U.S. 668, and should be left undisturbed under 28 U.S.C. § 2254(d). Ground Four is denied.

   **e. Ground Five: Petitioner alleges that trial counsel was ineffective for failing to object during closing argument to the prosecutor's remarks referring to the high homicide rate in the county and the need to stop murders.**

Petitioner claims that trial counsel was ineffective for failing to object to a portion of the State's closing argument regarding the high rate of homicides in St. Louis County. Specifically, the prosecutor stated:

> The constant shootings and murders have to stop. People can't just go around shooting each other, but that's how it seems it is lately because we live in a civilized society. Or do we live in a civilized society? Turn on the news. It certainly doesn't seem like it.
>
> You can start with stopping these murders. You, this jury, you can say, No. We are not going to allow this in St. Louis County. You can tell [Petitioner] it's not okay. We are not going to continue to tolerate dead 16-year-old boys in the streets. It's not okay. Even if you were robbed an hour and a half before, it's still not okay to shoot them down. Doc. [8-15] at 12.

16

At the post-conviction evidentiary hearing, trial counsel testified that she made a strategic decision not to object because she thought it would be without merit, given the jury's common sense, general knowledge of crime in the area, and the evidence adduced at trial.[6] The court of appeals found that it was reasonable trial strategy for trial counsel not to object to the State's remarks because any objection made by trial counsel would have been non-meritorious, based upon the jury's common sense, knowledge of crime in the area, all the evidence set forth in the case, and Missouri case law.[7] The court of appeals decision is not contrary to clearly established law and is consistent with a reasonable application of *Strickland*, 466 U.S. 668, and should be left undisturbed under 28 U.S.C. § 2254(d). Ground Five is denied.

  **f. Ground Six: Petitioner alleges that trial counsel was ineffective for introducing the topic of cell phone tower locations but not laying a proper foundation for it leading to the exclusion of the evidence.**

During the State's direct examination, Detective Hokamp testified there was no cell phone activity on Petitioner's phone between 1:49 p.m. and 2:30 p.m., and the shooting took place at approximately 2:00 p.m. Without such cell phone activity, Detective Hokamp testified that there would be no cell tower data demonstrating Petitioner's location during the time of the shooting, so there would be no value to the police in obtaining the information. During cross-examination,

---

[6] Trial counsel specifically noted the evidence relevant to her decision: Steven Azar's testimony indicated there were regular shootings in the neighborhood; St. Louis County police officers testified they responded to violent crimes multiple times during their careers; and one of the victims in this case, Ryan Thurman, was a dead sixteen-year-old boy in the street after he was murdered.

[7] A prosecutor has "wide latitude in drawing inferences from the record when presenting its closing argument." *State v. Shelton*, 529 S.W.3d 853, 865 (Mo. App. E.D. 2017) (quoting *State v. Forrest*, 183 S.W.3d 218, 228 (Mo. banc 2006)); (the State also has significant latitude in arguing the necessity of law enforcement, the jury's duty to convict the defendant and prevent crime, and the consequences to society if the jury were to fail to uphold the law. *Jones v. State*, 389 S.W.3d 253, 258 (Mo. App. E.D. 2012)); (the State is allowed to encourage the jury to send a message that the community will not tolerate such conduct, and the State may argue the protection of the public rests with the jury. *Id.*; *State v. Collins*, 150 S.W.3d 340, 354 (Mo. App. S.D. 2004)); (the State is also "permitted to argue general propositions regarding the prevalence of crime in the community, the personal safety of the community's citizens and the jury's duty to uphold the law including inferences regarding the jury's failure to convict and pleas to the jury's common experience." *Collins*, 150 S.W.3d at 354 (quoting *State v. Lumpkin,* 850 S.W.2d 388, 395 (Mo. App. W.D. 1993)).

however, trial counsel asked Detective Hokamp if information that Petitioner's cell phone pinged off cell phone towers in Chesterfield, South County, or Jefferson City near the time of the shooting would have been important, and that if such data would have established Petitioner's location approximately ten minutes before and a half an hour after the shooting. Detective Hokamp agreed that it would have been important. At the postconviction evidentiary hearing, trial counsel testified that in questioning Detective Hokamp about Petitioner's cell phone records, she was trying to establish that the police did not do a cell tower analysis to determine Petitioner's location shortly before the shooting and that this line of questioning was part of her trial strategy to discredit the police investigation and Detective Hokamp's credibility.

Petitioner claims trial counsel's performance fell below the standard of reasonably effective assistance during her questioning of Detective Hokamp, and that he was prejudiced because the jury heard no evidence of what towers Petitioner's cell phone pinged off of near the time of the shooting, and therefore, "the jury was free to speculate that the calls all could have been made within a small radius of the robbery and murder, offering [Petitioner] no defense." The court of appeals found that Petitioner's argument relies on the speculative assumption that the jury convicted Petitioner of the charged offenses based on an inference from Detective Hokamp's testimony rather than the overwhelming evidence, "(1) establishing [Petitioner] had a motive for shooting at the three boys because they had robbed him approximately an hour and a half earlier; and (2) linking [Petitioner] and his Girlfriend's vehicle to the crimes." Doc. [8-15] at 17.

The court of appeals ultimately found that Petitioner did not demonstrate he was prejudiced because his argument did not undermine its confidence in the outcome of the trial, i.e., he had not shown a reasonable probability the outcome of the proceedings would have been different but for trial counsel's alleged error. *See Hopkins v. State*, 519 S.W.3d 433, 436-37 (Mo.

18

banc. 2017), and that any alleged prejudice was speculative in that trial counsel's questioning of Detective Hokamp "just as easily could have aided in [Petitioner's] defense." Doc. [8-15] at 15.

The decision of the court of appeals is not contrary to clearly established law and is consistent with a reasonable application of *Strickland*, 466 U.S. 668, and should be left undisturbed under 28 U.S.C. § 2254(d). Ground Six is denied.

**g.     Ground Seven: Petitioner alleges that trial counsel was ineffective for not requesting to submit a jury instruction that the impeachment of alibi witness Jamar Henderson with his prior convictions should only be considered for Henderson's credibility.**

Petitioner claims trial counsel was ineffective for failing to request an instruction related to defense witness Henderson's testimony. The State elicited testimony from Henderson that as of the time of the trial, he was on probation for weapons and drugs charges, and had previously admitted to giving false information. The State also asked Henderson if Petitioner inquired with him about obtaining a gun from Henderson on the day of the shooting. Petitioner asserts trial counsel was ineffective for failing to request MAI-CR3d 310.14, which would have instructed the jury to consider evidence of Henderson's convictions for the sole purpose of Henderson's credibility and the weight to be given to his testimony, and that had the trial court submitted MAI-CR3d 310.14, "the jury would have disregarded the improper inferences drawn by the prosecutor from [ ] Henderson's testimony and would have acquitted [Petitioner] of one or more counts." Doc. [8-15] at 16.

To succeed on a claim trial counsel was ineffective for failing to request an instruction, the movant must demonstrate, *inter alia*, that prejudice resulted from counsel's alleged ineffectiveness. *Watson v. State*, 520 S.W.3d 423, 435 (Mo. banc 2017); *see also Zink*, 278 S.W.3d at 175-76. The court of appeals found that Petitioner's argument relied on the speculative assumption that the jury convicted Petitioner of the charged offenses based on an inference from

19

Henderson's testimony rather than the overwhelming evidence, "(1) establishing [Petitioner] had a motive for shooting at the three boys because they had robbed him approximately an hour and a half earlier; and (2) linking [Petitioner] and his Girlfriend's vehicle to the crimes." Doc. [8-15] at 17. The court of appeals ultimately found that Petitioner did not demonstrate he was prejudiced because his argument did not undermine the court's confidence in the outcome of the trial, in that he did not show a reasonable probability that the outcome of the proceedings would have been different but for trial counsel's alleged error. *See Hopkins*, 519 S.W.3d at 436-37. The decision of the court of appeals is not contrary to clearly established law, is consistent with a reasonable application of *Strickland*, 466 U.S. 668 (1984), and should be left undisturbed under 28 U.S.C. § 2254(d).

## **CONCLUSION**

**IT IS HEREBY ORDERED** that the Petition of Jeryl Daniels for a Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254, Doc. [1], is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner has not made a substantial showing of a denial of a constitutional right and this Court will not grant a certificate of appealability.

A separate judgment in accordance with the Memorandum and Order is entered this same date.

Dated this 15th day of March, 2022

MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE